**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JACK LIPTON,                                Case No. 1:24-cv-01029
                                            Chief Judge Hala Y. Jarbou
          Plaintiff,                        Magistrate Judge Sally J. Berens

v.

MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES,  et al.,

          Defendants.

---

**<ins>PLAINTIFF'S OPPOSITION TO DEFENDANTS MSU BOARD</ins>**
**<ins>AND NAMED BOARD MEMBERS, DEFENDANT DENNIS DENNO, AND</ins>**
**<ins>DEFENDANT REMA VASSAR'S MOTIONS TO DISMISS</ins>**

## TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................. 3

STANDARD OF REVIEW .............................................................................................. 11

ARGUMENT ..................................................................................................................... 12

    I.   PLAINTIFF HAS SUFFICIENTLY PLED A CLAIM OF FIRST AMENDMENT RETALIATION AS TO EACH OF THE NAMED DEFENDANTS ............................................................................. 12

         a.   *Plaintiff engaged in protected speech* ........................................... 13

         b.   *Plaintiff suffered adverse action* ................................................... 17

         c.   *Defendants are not entitled to qualified immunity* ........................ 26

    II.  PLAINTIFF IS ENTITLED TO PROSPECTIVE INJUNCTIVE RELIEF UNDER *EX PARTE YOUNG* 30

         a.   *Ongoing violation* ......................................................................... 31

         b.   *Plaintiff has pled his request for injunctive relief with adequate specificity* ............. 32

CONCLUSION ................................................................................................................. 34

Plaintiff, through undersigned counsel, respectfully submits this Opposition to Michigan State University Board of Trustees ("the Board") and Dianne Byrum, Dan Kelly, Renee Knake Jefferson, Sandy Pierce, Brianna T. Scott, and Kelly Tebay ("the Named Board Members")'s Motion to Dismiss (ECF No. 33), Dennis Denno's Motion to Dismiss (ECF No. 35) and Joinder (ECF No. 37), and Rema Vassar's Motion to Dismiss (ECF No. 38).[1]

## STATEMENT OF FACTS

Plaintiff, Dr. Jack Lipton, is the Founding Chair of the Department of Translational Neuroscience and the Associate Dean for Research Analytics in the College of Human Medicine at Michigan State University ("MSU"). PageID.66 at ¶1; PageID.73 at ¶49. Dr. Lipton was elected to serve as the Chair of MSU's Faculty Senate from August 16, 2023 to August 15, 2024. PageID.68 at ¶11; PageID.74 at ¶53. The Faculty Senate Chair is a liaison to the Board for over 3,800 faculty members and delivers a formal address to the Board at each public meeting on behalf of the faculty. PageID.68 at ¶12.

On October 20, 2023, MSU Trustee Brianna Scott issued an open letter alleging that Board Chair Rema Vassar engaged in numerous ethical violations and called for Vassar's resignation or removal from the Board. PageID.68 at ¶13; PageID.74 at ¶55. Scott's allegations included, among other things, Vassar threatening to falsely label Board Members "racist" if they did not side with her on a bylaws amendment issue. PageID.74-75 at ¶56. At an October 27, 2023 board meeting, Dr. Lipton spoke on behalf of the Faculty Senate. PageID.68 at ¶¶14-15.During his address, he read a passed resolution from the Faculty Senate that requested further investigation into Vassar's actions and called for Vassar's resignation. *Id.* at ¶15. Many Vassar supporters were in

---

[1]    Although Defendants' arguments vary, Plaintiff will address each of the Defendants' Motions in this single response for the sake of efficiency, distinguishing which arguments apply to which Defendants.

attendance—made up primarily of Michigan residents not affiliated with MSU, including Vassar's spouse and former sorority sisters, along with some students—and their actions caused the meeting to devolve into chaos. *Id.* at ¶16; PageID.76 at ¶62. When any attendee spoke out in support of holding Vassar accountable, Vassar's supporters interrupted, jeered them, and attempted to prevent them from completing their statements. *Id.* at ¶63. At one point, attendees openly breached the Board's Bylaws and voted amongst themselves to allow Vassar's husband to speak, usurping the authority of the Board. *Id.* at ¶¶64-66; PageID.78 at ¶72. As Chair, Vassar neither intervened to call her supporters to order—even when at least one attendee was escorted out of the meeting by police—nor did she uphold the rules of order governing board meetings. PageID.77 at ¶68. The meeting and resulting chaos garnered widespread public attention. PageID.68 at ¶16. Further, during the meeting, Trustee Renee Knake Jefferson corroborated Scott's allegation that Vassar had threatened to falsely label her opponents as racist. PageID.77 at ¶69. Jefferson noted that Vassar threatened to publicly call Board Members supporting an amendment to the Chair selection process "racist," which she followed through on. *Id.*

The following day, a Detroit News reporter approached Dr. Lipton for his perspective on Scott's allegations against Vassar and the Faculty Senate's vote to mitigate damage to the community due to Vassar's actions. PageID.68-69 at ¶¶17-18; PageID.77 at ¶70. In response to the reporter's request, Dr. Lipton said he would speak as a private individual and not on behalf of the Faculty Senate, and made the following statement:

> The board meeting yesterday, filled with Chair Vassar supporters, demonstrated Trustee Scott's charges of intimidation and bullying in action.  The chaos brought and disrespect shown by her supporters could have been stopped by a single statement from Chair Vassar, yet she elected to let the mob rule the room.

PageID.68 at ¶17; PageID.77 at ¶71.

After Dr. Lipton made these public comments, Vassar and Trustee Dennis Denno began a sustained effort of retaliation to discredit his truthful personal statements about the harm Vassar was causing the MSU community. PageID.69 at ¶18. On October 31, 2023, Vassar included in a meeting request to Dr. Lipton that she "would like to address [her] concerns regarding [his] depiction of our Black students." PageID.78 at ¶74. Vassar ultimately canceled this meeting; meanwhile, her supporters began to accuse Dr. Lipton of using racially charged language and exhibiting racial bias in his statement to The Detroit News—particularly citing his use of the word "mob." *Id.* at ¶¶75-76. The very next day, the NAACP Michigan State Conference Youth & College Division released a statement accusing Dr. Lipton of "racial terrorism." *Id.* at ¶78.

On November 1, 2023, Vassar and Denno met with students and encouraged them to attack Dr. Lipton and file false complaints of race discrimination against him. *Id.* at ¶77. Denno told students, "[t]he other thing you can do to help [Vassar and me], at least for me, is attack Jack Lipton, the Chair of the Faculty Senate." PageID.80 at ¶93. He told students, "I mean this guy called you a mob . . . call him out, call him a racist." *Id.*; PageID.87 at ¶125.

On November 4, 2023, the MSU Black Students Alliance ("BSA") issued a similar statement, accusing Dr. Lipton of "targeting a specific racial group," engaging in "a direct attack on Black students' character," and "[e]luding [sic] that black students intend to cause violence." PageID.78 at ¶79. On November 14, 2023, the MSU Black Faculty, Staff and Administrators Association ("BFSAA") released a similar public statement. PageID.79 at ¶80. And on November 20, 2023, *Diverse: Issues In Higher Education* published an op-ed authored by Vassar associate Clyde Barnett III on its nationally read website accusing Dr. Lipton of using the term "mob" to traumatize and silence Black and Palestinian students. *Id.* at ¶81. MSU student Miselo Chola filed

a complaint, at Vassar's behest, with MSU's Office of Institutional Equity ("OIE") accusing Dr. Lipton of race discrimination. *Id.* at ¶¶82-83.

MSU hired independent law firm Miller & Chevalier to investigate the allegations of misconduct against Vassar detailed in Scott's October 20, 2023 letter. PageID.86 at ¶116. Miller & Chevalier also investigated other concerns, including Vassar and Denno's retaliation against Dr. Lipton following his comments to The Detroit News. *Id.* at ¶117. In a report issued on February 28, 2024, Miller & Chevalier concluded that the students who had filed complaints and issued statements against Dr. Lipton were largely encouraged to do so by Vassar and Denno. *Id.* at ¶118. Vassar and Denno repeatedly coached and assisted students in drafting complaints and letters accusing Dr. Lipton of racism to local news outlets. PageID.87 at ¶121.

In addition to the November 1, 2023 meeting during which Vassar and Denno "pushed" students to attack Dr. Lipton, Denno contacted a Palestinian student activist via text, advising the student on how to frame their statement to the press attacking Dr. Lipton and providing them with a Detroit News reporter's email address. PageID.80-81 at ¶¶94-95; PageID.86 at ¶119. Denno advised the student to frame their statement as follows: "As an Arab American, Palestinian American, u [sic] feel threatened by Jack Lipton's racist comment calling u [sic] a part of a mob. He obviously has an anger management issue and the Faculty Senate should censure him." PageID.80-81 at ¶94. Denno summed up the message the student should provide to the reporter as, "Lipton=racist." PageID.81 at ¶95. The student later came to understand that Vassar and Denno "exploited [students'] racial identities" to further their personal campaign against Dr. Lipton. PageID.82 at ¶98 n.29 (stating to reporter, "I reflected back about how much they fueled…and exploited my anger and redirected it towards [Dr. Lipton]."). The student told Miller & Chevalier

that Vassar and Denno had pushed students to file a Higher Learning Commission ("HLC") complaint against Dr. Lipton. PageID.81 at ¶95.

On December 14, 2023, the Board held a private virtual meeting with all Board Members; faculty liaisons, including Dr. Lipton; and top administrators. PageID.79 at ¶84. During that meeting, Denno read a prepared statement in which both he and Vassar accused Dr. Lipton of "criminalizing students." *Id.* at ¶86. In the statement, Denno characterized Dr. Lipton's use of the word "mob" as "racism and violent language" and accused Dr. Lipton of "criminaliz[ing] our African American, Arab American, and Muslim American students." *Id.* at ¶¶87-88. Denno also criticized other Faculty Senate members for not "speaking out against [Dr. Lipton]," specifically telling them, "that's your job" and "if you're not going to not speak out against racism and violent language, you're not very good at academics." *Id.* at ¶88. Within hours of the meeting, the MSU Hurriya Coalition, which defines itself as "a collection of 20+ organizations fighting for freedom & justice in Palestine at MSU," posted an image of a complaint filed with HLC. PageID.80 at ¶90. The complaint accused Dr. Lipton of "criminalizing" students—the same language Denno had used at the meeting two hours earlier. *Id.* at ¶91.

Before the next public board meeting, on December 15, 2023 (held virtually due to security concerns that arose during the October 27th meeting), Vassar and Denno invited student members of BSA, MSU NAACP, and the MSU Hurriya Coalition to participate in the same room with them. PageID.82 at ¶¶97, 100; PageID.87 at ¶124. Press images clearly show Vassar and Denno attending the meeting together in the same room as students. PageID.82 at ¶98. Vassar and Denno organized these students to disparage Dr. Lipton during the public comment portion of the meeting— referring to him as a "racist" and accusing him of "criminalizing students." PageID.82 at ¶96; PageID.83 at ¶102.

7

Moreover, following Vassar and Denno's disparagement of Dr. Lipton, their instructions to students to file complaints and send letters against him, and Denno's statement that Faculty Senate members were not doing their job and "not very good at academics" for failing to criticize Dr. Lipton, some MSU faculty members began to distance themselves from Dr. Lipton. PageID.83 at ¶108. At a Faculty Senate meeting on November 21, 2023, one member issued a statement "in response to students, senators, and colleagues who have voiced concern over language [Dr. Lipton] used to describe the October 27th meeting," in which she clarified that "comments at academic governance meetings and in the press represent an individual and do not necessarily represent the views of the MSU Faculty Senate." PageID.84 at ¶109.

Vassar and Denno knew Dr. Lipton did not and has never made any racially biased statements and was not racist. *Id.* at ¶111. Vassar and Denno's coordinated retaliation, including their knowingly false and defamatory claims against Dr. Lipton—which the other Named Board Members implicitly approved—harmed his professional reputation and access to opportunities both within and outside of MSU. PageID.83 at ¶107; PageID.88 at ¶130. Likewise, the Faculty Senate meeting at which members spoke out against Dr. Lipton further harmed his reputation among his colleagues, peers, and the university community at large. PageID.84 at ¶110.

At the virtual December 15, 2023 board meeting, Dr. Lipton issued a statement apologizing for his use of the word "mob" and clarifying that he did not intend to use the word with any racial or discriminatory intent and that he was instead referring to the lack of order at the October 27th meeting. PageID.84-86 at ¶113. Both complaints filed with OIE and HLC, respectively, were closed without investigation, finding no grounds to investigate Dr. Lipton. PageID.86 at ¶¶114-115. When Vassar learned that HLC would not move forward with an investigation, one student noted that Vassar was "quite pissed." PageID.88 at ¶128.

After the Miller & Chevalier Report was issued, the Board voted on whether and how to discipline Vassar and Denno. PageID.88 at ¶131. It voted to censure Vassar and Denno for a limited period of less than nine months, despite its ability to censure them for a longer period. PageID.89 at ¶133; PageID.96 at ¶177. It also failed to recommend Vassar and Denno for removal, instead referring the matter to Governor Gretchen Whitmer's office for consideration of removal with no other finding. PageID.88-89 at ¶¶132-133; PageID.96 at ¶¶178-179. The censure imposed included removing Vassar and Denno from all assigned duties and suspended them from Board activities and benefits outside of their roles as elected officials for the remainder of 2024. PageID.89 at ¶134.

Vassar and Denno's false and retaliatory claims harmed and continue to harm Dr. Lipton's reputation and professional opportunities within his field. *Id.* at ¶135. On April 15, 2024, a superior told Dr. Lipton that the public attack on his character was seen as a liability for his consideration for the position of Associate Dean for Research Analytics. *Id.* at ¶137. In addition, in Dr. Lipton's search for higher level professional opportunities outside of MSU, an executive search firm associate shared that the public attacks on his character labeling him as a "racist" would negatively impact his employment chances, despite his superb qualifications. *Id.* at ¶138. As an at-large member of the Faculty Senate, MSU Bylaws on Academic Governance required Dr. Lipton to include his name on the ballot as a candidate for reelection as Faculty Senate Chair for the 2024-2025 school year. *Id.* at ¶139. However, because of the ongoing damage to his career and reputation due to Defendants' actions and inactions and to reduce his exposure to ongoing harassment, he actively campaigned against his own reelection. PageID.90 at ¶140. His candidate statement read: "DO NOT VOTE FOR ME." *Id.* As Trustee Kelly Tebay acknowledged to Dr. Lipton, "We ruined your career." *Id.* at ¶146. Scott similarly recognized the damage caused by Vassar, Denno, and the rest of the Board Members, stating, "You should sue us." *Id.* at ¶147.

Dr. Lipton has continued experiencing retaliation even after the imposed censure, which the Board did not enforce and which has now expired. PageID.92 at ¶156; PageID.96 at ¶181. On September 5, 2024, the Board met with top administrators including President Kevin Guskiewicz, Interim Provost Thomas Jeitschko, General Counsel Brian Quinn, and faculty. PageID.91 at ¶148; PageID.92 at ¶155. At that meeting, Vassar singled out Dr. Lipton and asked him to share an example of a lack of civil discourse in the last year by the Board, to which he cited an incident wherein Vassar displayed an explicit hand gesture (displaying the middle finger) for a prolonged period while Trustee Dianne Byrum and Scott were speaking. PageID.91 at ¶¶151-152. Despite clear video and photographic depictions of the explicit gesture which were confirmed by a report issued by MSU's Office of Audit, Risk and Compliance, Vassar told Dr. Lipton that the incident was both "false" and, inexplicably, "a result of eczema." *Id.* at ¶¶152-153. Vassar then told Dr. Lipton that he did not have any grounds to speak about civil discourse, since he had used the term "mob" to label students, and, in her opinion, had displayed an absence of self-reflection in his October 29, 2023 statement to The Detroit News. PageID.92 at ¶154. In other words, Vassar chose to target Dr. Lipton, affirmatively seek his commentary, and disparage him for his honest response, while at the same time mischaracterizing his quote as "labeling students," to embarrass and humiliate him in front of his superiors and colleagues. *Id.* at ¶156.

Further, on September 29, 2024, at an investiture ceremony for President Guskiewicz, the Board allowed Vassar and Denno to sit on the stage with university leaders and visiting dignitaries with the rest of the Board in full academic regalia, despite being suspended from all board-related activities. PageID.93-94 at ¶¶162-163. This act constituted a deliberate public display of support for Vassar and Denno and blatant disregard for the censure. PageID.94 at ¶164. Dr. Lipton, upon invitation, also attended the ceremony and subsequent reception. *Id.* at ¶¶165-167. Seeing Vassar

10

and Denno mingling with MSU leadership shocked and humiliated Dr. Lipton. PageID.95 at ¶169. By allowing Vassar and Denno to attend the investiture events in violation of the imposed censure, Defendants further humiliated and silenced Dr. Lipton. *Id.* at ¶170.

On November 15, 2024, BSA posted an accusation on Instagram falsely charging Dr. Lipton with "continuously harass[ing]" student member Miselo Chola.  *Id.* at ¶171. The post, in an apparent response to the instant lawsuit, reads, "BSA was mentioned in a lawsuit . . . accused of being 'manipulated' into activism, undermining our voices." *Id.* at ¶172. This demonstrates the Named Board Members' continued failure to properly address and remedy the ongoing retaliation by Vassar and Denno towards Dr. Lipton. *Id.* at ¶174. Moreover, the official censure ended on January 1, 2025, leaving Vassar and Denno full, unfettered access to all the powers, privileges, and duties of the MSU Board of Trustees. PageID.96 at ¶181.

## **STANDARD OF REVIEW**

Defendants seek dismissal of Plaintiff's Amended Complaint both based on Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim as well as Eleventh Amendment immunity from suit for state officials under Rule 12(b)(1).[2] To survive a motion to dismiss, a complaint must contain a "short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The United States Supreme Court has held that a complaint is only properly dismissed under Rule 12(b)(6) when it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This plausibility standard is more than a sheer possibility, but it is not a probability requirement. *See Twombly*, 550 U.S. at

---

[2]    Although Vassar's Motion references Rule 12(b)(2), her Brief is silent on this argument.  Therefore, she has effectively waived this defense.  *See, e.g., Evans v. Vinson*, 427 F. App'x 437, 447 (6th Cir. 2011), in which the Sixth Circuit found that defendants' failure to argue both prongs of a qualified immunity defense constituted a waiver of the defense.

556. A complaint states a plausible claim for relief, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Vest v. Resolute FP US Inc.*, 905 F.3d 985, 987 (6th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (citing *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). Therefore, "a well-pleaded complaint may proceed even if it strikes a savvy judge that the actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citations omitted).

Motions to dismiss based on Eleventh Amendment immunity fall under Rule 12(b)(1), which encompasses dismissals for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1); *Crump v. Blue*, 121 F.4th 1108, 1113 (6th Cir. 2024). As with Rule 12(b)(6) motions to dismiss, facial challenges to subject-matter jurisdiction under Rule 12(b)(1) test the sufficiency of the pleading; thus, courts must similarly accept well-pleaded allegations in the complaint as true. *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

## **ARGUMENT**

### I.    **Plaintiff has sufficiently pled a claim of First Amendment retaliation as to each of the named Defendants**

Plaintiff has adequately alleged a claim of First Amendment retaliation against Vassar, Denno, and the Named Board Members. To plead First Amendment retaliation, a plaintiff must allege that: (1) "the plaintiff engaged in conduct that is protected by the Constitution or by statute," (2) "the defendant took an adverse action against the plaintiff," and (3) "this adverse action was taken (at least in part) because of the protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999). Defendants take issue with the first and second elements (protected speech and

adverse action) and argue they are entitled to qualified immunity.[3] Each of these arguments will be addressed in turn below.

### a. Plaintiff engaged in protected speech

Vassar, Denno, and the Named Board Members argue that Plaintiff did not engage in protected speech when he shared his opinion on Vassar's alleged misconduct and the chaotic nature of the October 27, 2023 board meeting with The Detroit News. *See* PageID.175-77; PageID.215-17; PageID.248-51. When Dr. Lipton spoke to The Detroit News journalist following the October 27th board meeting, he spoke as a private citizen and not pursuant to his ordinary job duties; thus, his speech is protected by the First Amendment.

The First Amendment protects speech only when an employee speaks as a private citizen as opposed to pursuant to the employee's job duties. *Garcetti v. Caballos*, 547 U.S. 410, 421-22 (2006). In *Lane v. Franks*, the Supreme Court limited this exception to First Amendment protection for public employees by clarifying that "[t]he critical question [ ] is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Boulton v. Swanson*, 795 F.3d 526, 533-34 (6th Cir. 2015) (quoting *Lane*, 573 U.S. 228, 240 (2014)). In doing so, the Supreme Court emphasized the value of public-employee speech about matters related to their employment. *Id.* In other words, "although *Garcetti* carves out an exception to First Amendment protection for speech that 'owes its existence to a public employee's professional responsibilities,' this exception 'must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment.'" *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017) (quoting *Boulton*, 795 F.3d at 534); *Id.* at 463 (explaining that the Supreme Court's intent in adding the word "ordinary" was to avoid

---

[3]    The Named Board members only make an argument regarding the first element—protected speech, and they do so within the confines of their qualified immunity argument.  PageID.176-77.

transforming broad swaths of speech by employees into unprotected employee-speech "simply because it concern[ed] . . . the speaker's public employment"). To assess "whether the speech at issue is itself ordinarily within the scope of an employee's duties," courts consider the circumstances surrounding the speech, including the individual's actual job duties, the motivation behind the speech, the setting of the speech (i.e., on-the-clock at the office versus off-the-clock outside of work), and the speech's audience (i.e., speech to supervisors versus speech to outside individuals). *Id.* (quoting *Lane*, 573 U.S. at 240); *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021).

For example, in *DeCrane v. Eckart*, the Sixth Circuit found that the plaintiff, the training director for a fire department, acted as a private citizen in reporting training issues to the media. 12 F.4th at 596-97. The court reasoned that nothing in his job duties involved speaking to the media, and the speech at issue was made to those outside his chain-of-command—to a journalist. *Id.* The court rejected the argument that the plaintiff's report to the media fell within his job duties simply because it concerned training and was therefore directly related to his duties as training director. *Id.* at 598. As the court held, "[t]he Supreme Court has made clear that employees do not speak 'on the job' simply because they speak *about* the job." *Id.* (quoting *Lane*, 573 U.S. at 239-40); *see also Ashford v. Univ. of Mich.*, 89 F.4th 960, 972 (6th Cir. 2024) (finding police officer who spoke to media about university's mishandling of sexual assault case spoke as private citizen because his job duties did not involve speaking to the media); *Westmoreland v. Sutherland*, 662 F.3d 714, 716, 719-20 (6th Cir. 2011) (finding firefighter's speech at town hall meeting was not made pursuant to his official duties while speaking as an expert about knowledge related to his employment).

Here, nothing in the Amended Complaint suggests that Dr. Lipton's ordinary job duties as Faculty Senate Chair included speaking to the media, nor do Defendants argue such. Defendants' failure to so much as argue that Plaintiff's statement to The Detroit News was part of his ordinary job duties is fatal to their argument that his speech is not covered by the First Amendment. *See Allard v. Mich. House of Reps.*, 200 F.Supp.3d 703, 709 (W.D. Mich. 2016) (denying motion to dismiss First Amendment retaliation claims where defendant "pointed to nothing that even insinuates that [plaintiffs' speech] was in the ordinary course of [plaintiffs'] duties); *DeCrane*, 12 F.4th at 957 (noting that nothing in plaintiff's job description or "de facto" duties included speaking to the media). As Faculty Senate Chair, Dr. Lipton served as a liaison between the Faculty Senate and the Board. PageID.68 at ¶12. During the October 27, 2023 meeting, he spoke on behalf of the Faculty Senate, as it was his role as Chair to deliver a formal address to the Board at each public meeting. *Id.* at ¶¶12, 14. However, when a Detroit News reporter approached him the day after the October 27th meeting, he told the reporter that he would speak as a private individual and not on behalf of the Faculty Senate. PageID.68-69 at ¶17; PageID.77 at ¶71. Dr. Lipton gave his personal opinion about his observations of the chaotic nature of the meeting and, in his view, Vassar's failure to maintain order. *Id.* Thus, Dr. Lipton's statement to the press was not made in the ordinary course of his duties as Faculty Senate Chair.

The other factors courts consider in assessing whether a plaintiff's speech was made in the course of his ordinary job duties confirm that Dr. Lipton was speaking as a private citizen. Regarding the impetus for Dr. Lipton's statement to The Detroit News, in a subsequent statement he made at the December 15, 2023 board meeting, he stated that his "goal was to support Trustee Brianna Scott in her courageous attempt to hold the Chairperson accountable." PageID.84-86 at ¶113. As the Supreme Court and Sixth Circuit have emphasized, just because speech relates to a

public employee's job does not bring it outside the protections of the First Amendment. *Lane*, 573 U.S. at 240; *DeCrane*, 12 F.4th at 598 (holding that "employees do not speak 'on the job' simply because they speak *about* the job"). In fact, there is "special value" in protecting public employees' speech concerning perceived corruption and misconduct based on their inside knowledge and observations. *Lane*, 573 U.S. at 240. Dr. Lipton's statement to The Detroit News concerned Vassar's failure to maintain order at the October 27th meeting, resulting in a meeting widely described as "chaotic, with participants shouting over each other and interrupting speakers." PageID.68-69 at ¶¶16-17; PageID.88 at ¶129. This statement, based on his personal observations, was not made in furtherance of his job responsibilities as a liaison between the Faculty Senate and the Board. Nor was his statement made "on the clock," as the interview occurred when a reporter approached him the day following the meeting. PageID.68-69 at ¶17; PageID.77 at ¶71; *DeCrane*, 12 F.4th at 596 (speech made outside of job duties more likely to be protected). Similarly, the audience of Dr. Lipton's speech—the general public—weighs in favor of finding that he engaged in protected speech. *DeCrane*, 12 F.4th at 596; *Ashford*, 89 F.4th at 972 (finding police officer's media leak regarding mishandling of investigation protected speech); *Miller v. City of Canton*, 319 F. App'x 411, 417 (6th Cir. 2009) (finding police officer's "press release" concerning racial discrimination in the department protected speech).

The Named Board Members and Vassar stress the fact that the journalist who published the article chose to identify Dr. Lipton's title as Faculty Senate Chair. *See* PageID.176-77; PageID.250-51. First, it was the journalist's decision to include this information, not Dr. Lipton's. Dr. Lipton told the reporter that he was *not* speaking on behalf of the Faculty Senate. PageID.77 at ¶71. Second, the reporter likely identified Dr. Lipton's position as Faculty Senate Chair to explain his presence at the meeting during which he observed Vassar's failure to maintain order and illustrate

16

his expertise on how such meetings should be conducted. On this point, Defendants' attempt to conflate Dr. Lipton's speech during the meeting and his subsequent speech to a journalist is unavailing. In any event, the Sixth Circuit has found that a public employee—identified as such—engaged in protected speech when doing so outside of his ordinary job duties. *See Westmoreland*, 662 F.3d at 719.

Defendants' reliance on the pre-*Lane* standard instructing courts to consider whether a plaintiff's speech "owes its existence to his professional responsibilities" is improper. PageID.177; PageID.216; PageID.251; *see Mertins v. City of Mt. Clemens*, No. 19-1416 (6th Cir. Jun. 5, 2020) (remanding case to district court to apply correct framework outlined in *Lane v. Franks*). For these reasons, Dr. Lipton's statement to The Detroit News was not made in the ordinary course of his job duties; thus, his speech falls under the ambit of the First Amendment.

### b.  Plaintiff suffered adverse action

Vassar and Denno[4] also assert that Dr. Lipton has not adequately alleged that Defendants took an adverse action in retaliation for his protected speech to The Detroit News, and relatedly, that he has not adequately alleged injury for purposes of his § 1983 First Amendment claim. *See* PageID.178; PageID.216-220; PageID.251-57. Plaintiff has adequately alleged adverse action based on Vassar and Denno's retaliatory campaign against him which caused concrete damage to his reputation and career as well as emotional distress.

The term "adverse action arose in the employment context" and "generally envisions a material change in employment status or benefits such as discharge or failure to promote." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). However, in the context of a First Amendment retaliation claim, an adverse action is one that would "likely chill a person of ordinary

---

[4]    The Named Board Members do not argue that Dr. Lipton did not experience adverse action.  Thus, this section focuses on Vassar and Denno's conduct.

firmness from continuing to engage in that activity." *Ryan v. Blackwell*, 979 F.3d 519, 525 (6th Cir. 2020). This may include things like, "harassment or publicizing facts damaging to a person's reputation." *Id.* (quoting *Fritz*, 592 F.3d at 724). The degree of harassment that would sufficiently chill speech is "not extreme." *Perkins v. Twp. of Clayton*, 411 F. App'x 810, 814 (6th Cir. 2011). As the Sixth Circuit explained in *Block v. Ribar*, "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." 156 F.3d 673, 679 (6th Cir. 1998). Thus, courts generally will not conclude as a matter of law that a defendant's actions were insufficient unless they were "*de minimis*" or "inconsequential." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002); *see also Maben*, 877 F.3d 252, 226 (6th Cir. 2018) ("'[I]n general, the adverseness question should survive the pleading stage.'") (quoting *Kennedy v. Bonevelle*, 413 F. App'x 836, 840 (6th Cir. 2011)). Courts must tailor their analysis under the adverse action prong to the specific circumstances of the retaliation claim at issue. *See Mattox*, 183 F.3d at 522 (finding public officials, such as the plaintiff in that case, may "need to have a thicker skin than the ordinary citizen"). Dr. Lipton is not a public official, and the individual Board Members are not his employers. Vassar and Denno's actions illustrate this—if they had been Dr. Lipton's employers and believed his comments to The Detroit News violated workplace rules, they could have put him on a performance improvement plan or disciplined him rather than coordinating an elaborate campaign to destroy his reputation via students and other third parties and attempting to bully Faculty Senate into censuring him. Thus, the heightened standard for adverse action in the employment context is inapplicable.[5]

---

[5]    Defendants' reliance on employment cases to argue a lack of adverse action is misplaced. *See* PageID.217-18; PageID.256.

Several cases have found that a defendant's retaliatory action in the form of speaking out negatively against a plaintiff to those with influence over the plaintiff to constitute adverse action for purposes of a First Amendment claim. For example, in *Davis v. Robert*, the court found adverse action adequately alleged where the defendant said negative things about the plaintiff to union members to try to remove the plaintiff from his position as a union representative. 192 F. Supp. 3d 847, 857-59 (E.D. Mich. 2016). As the court reasoned, "[a]cknowledging the power of persuasion . . . makes sense; a person of ordinary firmness would likely be deterred from participating in protected activity by the prospect of an influential public official endangering his or her economic livelihood . . . ." *Id.* at 858. Likewise, in *Fritz v. Charter Twp. of Comstock*, the Sixth Circuit found adverse action adequately pled where the defendant contacted the plaintiff's employer expressing his opposition to the plaintiff's speech and hinting that the plaintiff's continued speech may harm the employer's reputation in the community. 592 F.3d 718, 725-26 (6th Cir. 2010). Although the plaintiff in *Fritz* had not specifically alleged that the defendant threatened her business or attempted to persuade her employer to fire her, the court reasoned that "a person of ordinary firmness would be deterred from engaging in protected conduct, if as a result, a public official encouraged her employer to terminate the person's contract or to have her change her behavior." *Id.* at 125-26. Moreover, in *Barrett v. Harrington*, the Sixth Circuit affirmed the district court's denial of summary judgment where the defendant—a judge—in retaliation for the plaintiff's protected speech, publicly accused the plaintiff of stalking and harassing her despite her acknowledgement in her deposition that she had reviewed the applicable stalking statute and determined that it did not apply to the plaintiff's conduct. 130 F.3d 246, 262-64 (6th Cir. 1997).

Here, Dr. Lipton plausibly alleges that following his statement to The Detroit News, Vassar and Denno engaged in a targeted retaliatory campaign against him designed to damage his

reputation and career with the tacit approval of the other Named Board Members. Dr. Lipton is not a public official, and the individual Board Members are not his employers;  thus, the *Davis* and *Fritz* cases discussed above are both applicable and persuasive. As outlined in greater detail above, following Dr. Lipton's protected speech, Denno read a joint statement during a meeting attended by the Board, faculty liaisons, and top administrators in which he and Vassar accused Dr. Lipton of "criminalizing students," "racism," and the use of "violent language." PageID.79 at ¶¶84, 87. Denno also encouraged faculty members, over whom he had significant influence, to denounce Dr. Lipton. *Id.* at ¶88. Behind the scenes, Vassar and Denno met with students and "pushed" them to attack Dr. Lipton and file complaints against him. PageID.78 at ¶¶74-77; PageID.80-82 at ¶¶92-95; PageID.86 at ¶118. Denno told students that they could "help" him and Vassar by "attack[ing]" Dr. Lipton and calling him a "racist." PageID.80 at ¶93; PageID.87 at ¶126. Denno went so far as to give express advice on how to frame one student's statement to the press and provided a reporter's contact information. PageID.80-82 at ¶¶94-95; PageID.86-87 at ¶119; PageID.87 at ¶121. Vassar and Denno continued to use students as a mouthpiece to publicly denounce Dr. Lipton when they invited students to attend the virtual December 15, 2023 board meeting in the same room with them. PageID.82 at ¶¶96, 100; PageID.87 at ¶124. During the meeting, students repeated the language promulgated by Vassar and Denno—calling Dr. Lipton a "racist" and accusing him of "criminalizing" students. PageID.83 at ¶102. Dr. Lipton continued to experience retaliation when, during a September 5, 2024 meeting with top administrators, Vassar publicly singled out Dr. Lipton for his commentary only to accuse him of labeling students and exhibiting a lack of civil discourse and self-reflection. PageID.91-92 at ¶¶148-156. In sum, as in *Davis* and *Fritz*, where defendants held substantial power to negatively impact plaintiffs' reputations and careers, Vassar and Denno similarly abused their power and influence in the community to chill

20

Dr. Lipton's speech by damaging his reputation and threatening his employment prospects at MSU and the larger academic community.

Vassar and Denno's influence and ability to negatively impact Dr. Lipton had real results. The Amended Complaint describes concrete and personalized injury to Dr. Lipton that cannot be deemed "*de minimis*" as a matter of law. *Bell*, 308 F.3d at 603. In addition to their own public statements, and those of the students they organized impugning Dr. Lipton's reputation, individual students and student groups issued statements and filed complaints against Dr. Lipton. PageID.78 at ¶¶78-79; PageID.79 at ¶¶82-83; PageID.80 at ¶90. Moreover, some Faculty Senate members began distancing themselves from Dr. Lipton, with one member publicly distancing themselves and the Faculty Senate from Dr. Lipton's statement to the press. PageID.83-84 at ¶108-9. Vassar and Denno's efforts to assail Dr. Lipton's reputation has damaged his career and job prospects inside and outside of MSU. PageID.89 at ¶135. Dr. Lipton has been denied consideration for advanced positions in his field, *id.* at ¶136, with one supervisor acknowledging that the public attack on his character was seen as a liability for his consideration of the position of Associate Dean for Research Analytics, *id.* at ¶137. Further, in his search for higher level professional opportunities outside of MSU, he was told that the attacks on his character labeling him a "racist" would negatively impact his employment chances, despite his qualifications. *Id.* at ¶138. As Tebay told Dr. Lipton, "[w]e ruined your career." PageID.90 at ¶146. To reduce exposure to further harassment, Dr. Lipton stepped down as Faculty Senate Chair and campaigned against his own re-election. *Id.* at ¶140.

In *Davis*, the court found that the plaintiff adequately alleged injury based on emotional harm resulting from the defendant's effort to cause plaintiff to lose his position as a union representative. 192 F. Supp. 3d at 858-59. By saying negative things about the plaintiff, the

defendant threatened the plaintiff's position. *Id.* And although the plaintiff did not actually lose his job as a result, the court found that plaintiff's emotional harm resulting from the defendant's threat to his livelihood amounted to measurable harm. *Id.*

Vassar's reliance on *Mattox* to argue that Plaintiff has not adequately alleged injury based on emotional harm is not persuasive. PageID.254 (citing *Mattox*, 183 F.3d at 522).  There, the court found that one plaintiff—an elected official—did not adequately allege adverse action primarily because she was held to a higher standard as a public official seeking reelection. *Mattox*, 183 F.3d at 522. Dr. Lipton, as Faculty Senate Chair, was hardly a "public official," and even if he were required to endure slightly more than the average person, someone in his position would have surely been deterred from engaging in protected conduct in the face of a targeted campaign to discredit him and destroy his reputation. This is especially so given the value placed on open-mindedness and integrity in high-level academia. For example, in *Davis*, the defendant argued that the plaintiff, a former elected board member and "union and community activist" should "have thicker skin than the ordinary citizen when it comes to attacks on their views."  192 F. Supp. 3d at 852 (quoting *Mattox*, 183 F.3d at 522).  There, the court rejected this argument because the plaintiff had endured more than just an attack on his views, having faced "a targeted campaign" to end his union representation. *Id.* at 859. Dr. Lipton similarly faced a targeted campaign designed to destroy his reputation and threaten his career.

The *Mattox* court further found that a second plaintiff did not adequately allege adverse action based on the release of private information touching on a traumatic childhood experience and her personal relationships. *Mattox*, 183 F.3d at 523. The court found that this information, buried in a public report as opposed to the central focus of speech spoken directly from the defendant, did not rise to a level of cognizable harm. *Id.* The court also found that the plaintiff

offered only "generalized statements about the effect on her character and reputation." *Id.* By contrast, Vassar and Denno's attacks on Dr. Lipton labeling him a racist and accusing him of criminalizing students either came directly from their mouths or were the central focus of adverse action, and Dr. Lipton has offered more than generalized statements of harm. As discussed above, the Amended Complaint describes in detail the impact their attack campaign has had on his reputation and career, including being told multiple times that being labeled a "racist" would negatively impact his future career. PageID.89 at ¶¶137-138. Dr. Lipton also campaigned against remaining in his position as Faculty Senate Chair to shield himself from further public attacks. PageID.90 at ¶140.

Vassar and Denno's attempt to avoid liability by minimizing their actions, pinning the blame on each other, and claiming a lack of responsibility for the actions of the students they organized is unpersuasive. PageID.217-20; PageID.255-57. For example, Vassar ignores her involvement in the joint statement Denno read at the December 14, 2023 virtual meeting, despite Plaintiff's assertion in the Amended Complaint that "Denno read a prepared statement in which *he and Vassar* accused Dr. Lipton of 'criminalizing students.'" PageID.79 at ¶86 (emphasis added). Both Denno and Vassar met with students and encouraged them to attack Dr. Lipton, and as the Miller & Chevalier Report concluded, the students who had filed complaints and issued statements against him were largely encouraged to do so by both Vassar and Denno. PageID.78 at ¶77; PageID.86 at ¶118. In short, the actions of each Defendant as outlined in the Amended Complaint and discussed herein plausibly allege that Vassar and Denno took adverse action in retaliation for Dr. Lipton's protected speech.

In *Fritz* and *Davis*, the alleged adverse action similarly involved the defendants' disparagement of the plaintiffs to third parties, who subsequently took or had the potential to take

further negative action against the plaintiffs. *Fritz*, 592 at F.3d at 726; *Davis*, 192 F. Supp. 3d at 857. In each case, the court found that the defendants' actions—disparaging the plaintiffs with the potential to do further damage—constituted adverse action for purposes of the plaintiffs' First Amendment retaliation claims. *Id.* More specifically, in *Davis*, where the defendant "said bad things" to the plaintiff's fellow union members, the defendant argued that her actions "were limited to attempts to get others . . . to take action against [the plaintiff]." 192 F. Supp. 3d at 857. The court held that "this position misses the point," as the defendant's effort to have the plaintiff removed from his union role *was* the adverse action and not the plaintiff's subsequent (unrelated) termination. *Id.* Likewise, here, in addition to Vassar and Denno's own public disparagement of Dr. Lipton (PageID.79 at ¶¶86, 88; PageID.91-92 at ¶¶150-156), their orchestrated effort to organize and encourage students, faculty, and others to "attack" Dr. Lipton also constituted adverse action.

Not only were Vassar and Denno's public disparagement of Dr. Lipton and their encouragement of others to do so designed to chill his protected speech opposing Vassar, but their statements against him were also defamatory and false. Several courts have found that labeling someone a "racist" can, in context, constitute defamatory speech that is not protected by the First Amendment. *Armstrong v. Shirvell*, No. 13-2368 (6th Cir. Feb. 2, 2015) (collecting cases finding that words like "racist" "have a clear, well understood meaning[]" and are "capable of being defamatory"); *O'Brien v. City of Saginaw*, No. 10-12700 (E.D. Mich. Jan. 3, 2011). As alleged in the Amended Complaint, "[a]s Vassar and Denno well knew, Dr. Lipton did not and has never made any racially biased statements and is not racist." PageID.84 at ¶111; PageID.88 at ¶130. In fact, Vassar has a history of threatening to falsely label her adversaries as racist. *See* PageID.77 at ¶69 (Jefferson corroborated Scott's allegation that Vassar threatened to label her opponents as

racist, described an occasion when Vassar stated that she would publicly call those opposing her position as racist, and noted that she followed through on that threat). Further, as Dr. Lipton explained, his reference to "mob rule" following the October 27, 2023 board meeting was meant to convey the lack of order at the meeting and to describe a situation in which Vassar's supporters were permitted to bypass the rules of procedure, thereby effectively usurping the power of the Board. PageID.78 at ¶72.

Viewing the facts in the light most favorable to Dr. Lipton, the context of Vassar and Denno's campaign against him raise a plausible inference that their statements labeling him a "racist" and accusing him of "criminalizing" students were knowingly false and defamatory. Accordingly, their undeveloped arguments that his claim should fail because their own speech against him was protected are unavailing. *See* PageID.222; PageID.253; *Barrett*, 130 F.3d at 262-64 (permitting First Amendment retaliation claim to proceed to trial where defendant knowingly made false negative statements about plaintiff). In any event, Vassar and Denno's adverse action went beyond merely responding to his statement to The Detroit News with their own speech—rather, it involved a coordinated effort to discredit him and destroy his reputation via their supporters, students, and faculty.[6] These actions did ultimately result in chilling Dr. Lipton's speech, as he took action to remove himself from the Faculty Senate Chair role for the 2024-2025 academic year. For these reasons, Dr. Lipton has adequately alleged adverse action for purpose of his First Amendment retaliation claim.

---

[6]    Vassar's reliance on *Taylor v. City of Falmouth*, 187 F. App'x 596, 599-601 (6th Cir. 2006), is also not persuasive.  PageID.254.  This case involved a single instance of name-calling, *Taylor*, 187 F. App'x at 598, and is not at all comparable to Vassar and Denno's sustained efforts to discredit Dr. Lipton, including by making false and defamatory statements in front of his colleagues and top administrators.

### c.  Defendants are not entitled to qualified immunity

Defendants also argue that, to the extent they are being sued in their individual capacities, they are entitled to qualified immunity. PageID.174-79; PageID.221-22; PageID.257-58. To assess whether a public official is entitled to qualified immunity, courts must first determine whether the defendant violated a constitutional or statutory right, and if so, whether the right was "clearly established" at the time of the violation. *Perez v. Oakland Cnty.*, 466 F.3d 416, 426 (6th Cir. 2006). At the pleading stage, a plaintiff must set forth facts that, viewed in the light most favorable to him, plausibly assert "that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Qualified immunity does not, however, require plaintiffs to have a "case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Whether a right was clearly established is determined by looking first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal. *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015); *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 347 (6th Cir. 2001).

Granting qualified immunity at this early stage of litigation would be inappropriate. Although qualified immunity should be resolved as early as possible, "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015); *see also Johnson*, 790 F.3d at 653 (noting that only "insubstantial claims against government officials should be resolved" prior to discovery). "Qualified immunity is a question of law, but where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Bazzi v. City of Dearborn*, 658 F.3d 598, 606 (6th Cir. 2011). As discussed above, whether Defendants

engaged in adverse action in retaliation for Dr. Lipton's protected speech is a question of fact. *Bell*, 308 F.3d at 603. Thus, Plaintiff's retaliation claim should proceed to discovery.

In any case, Plaintiff has demonstrated that Defendants violated his clearly established right to criticize a public official without facing retaliation. As discussed above, Plaintiff has plausibly alleged that he engaged in protected speech when he spoke to The Detroit News reporter following the October 27, 2023 board meeting. That his speech was protected by the First Amendment was clearly established by Sixth Circuit precedent. "Freedom to criticize public officials and expose their wrongdoing is at the core of the First Amendment . . . ." *Barrett*, 130 F.3d at 263. Further, as the Sixth Circuit stated in *DeCrane v. Eckart*, "[w]e ha[ve] held that employees speak as private citizens (not public employees) at least when they speak on their own initiative to those outside their chains of command and when their speech was not part of their official or de facto duties." 12 F.4th at 599-600. Like the plaintiff in *DeCrane*, Dr. Lipton spoke to the media and his speech was outside his official duties. Thus, it was clearly established at the relevant time that Dr. Lipton was engaging in protected speech. *See also Westmoreland v. Sutherland*, 662 F.3d 714, 716, 719-20 (6th Cir. 2011) (finding firefighter's speech at town hall meeting not made pursuant to his official duties while speaking as an expert about knowledge related to his employment); *Miller v. City of Canton*, 319 F. App'x 411, 417 (6th Cir. 2009) (finding police officer's "press release" concerning racial discrimination in the department protected speech).

Similarly, Plaintiff's right to be free from a targeted campaign to discredit him and damage his career and reputation in retaliation for exercising his First Amendment right was clearly established at the time the violation occurred. The Sixth Circuit in *Fritz* established that a public official's expression of displeasure with the plaintiff's protected speech to third parties with influence over the plaintiff, effectively threatening plaintiff's livelihood, can amount to adverse

action for purposes of a First Amendment retaliation claim. 592 F.3d at 726; s*ee also Davis*, 192 F. Supp. 3d at 860 (rejecting qualified immunity claim in reliance on *Fritz* where defendant said negative things about plaintiff to cause him to lose his position). In *Barrett*, the Sixth Circuit also established that a public official making knowingly false retaliatory accusations against the plaintiff amounts to adverse action. 130 F.3d at 262-63. Based on these precedents, a public official in Vassar and Denno's position should have reasonably known that publicly disparaging Dr. Lipton in front of his colleagues and superiors and using their influence to cause others to do the same and file complaints against him—thereby damaging his reputation and career—in retaliation for his protected speech amounted to adverse action. And for the reasons discussed above, Vassar and Denno's arguments that their own false and defamatory speech was protected is not persuasive. Sixth Circuit precedent has clearly established that there are limits to the protections of the First Amendment, which does not extend to making retaliatory statements that are knowingly false or defamatory and designed to impugn a plaintiff's reputation. *See Barrett*, 130 F.3d at 262-64; *Armstrong*, No. 13-2368 (6th Cir. Feb. 2, 2015) (collecting cases finding that words like "racist" "have a clear, well understood meaning[]" and are "capable of being defamatory"). In addition, their adverse action went beyond their own public remarks and involved meeting with students and organizing supporters to disparage Dr. Lipton and file complaints against him.

The Named Board Members argue that, to avoid application of qualified immunity, Dr. Lipton would have to provide an analogous case involving university board members who were found to have violated the First Amendment when other members engaged in a public campaign against a faculty member. PageID.178. However, that level of specify is not required. *See Ashcroft*, 563 U.S. at 741 (stating that plaintiffs are not required to have a "case directly on point"). The Named Board Members seem to be making two arguments: first, that they are not responsible for

28

Vassar and Denno's attack campaign against Dr. Lipton; and second, that they did enough in response to avoid liability.

The Sixth Circuit has clearly established that a plaintiff may hold a supervisory official liable under § 1983 where that supervisory official "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradely*, 728 F.2d 416, 421 (6th Cir. 1984). The Named Board Members do not dispute Plaintiff's allegations that they had authority over Vassar and Denno. PageID.72 at ¶39; PageID.92-96 at ¶¶159-181. The Named Board members witnessed Vassar and Denno's public disparagement and retaliatory conduct on several occasions, including at the December 14, 2023 meeting during which Denno read the joint statement accusing Dr. Lipton of racism and criminalizing students; and the December 15, 2023 virtual board meeting. PageID.79 at ¶¶84-89; PageID.82 at ¶96; PageID.83 at ¶102; PageID.83-85 at ¶¶105-116; PageID.97 at ¶188. They gained further knowledge of the extent of Vassar and Denno's retaliatory campaign against Dr. Lipton, including pressuring students to file complaints against him, via the Miller & Chevalier Report. *Id.* at ¶189. The Board voted to censure Vassar and Denno for a limited period of less than nine months based on the findings of the Miller & Chevalier Report, which addressed a wide range of accusations against the pair, including that they had engaged in numerous ethical violations and violations of their duties as trustees. PageID.96 at ¶178. The Board also recommended to the Governor that Vassar and Denno be considered for removal. *Id.* at ¶179.

However, at no time did any of the Named Board Members speak up or intervene during Vassar and Denno's public disparagement of Dr. Lipton, nor did the censure or recommendation to the Governor specifically acknowledge or redress the retaliation and false accusations against Dr. Lipton. Further, the Named Board Members failed to enforce the censure. PageID.94 at ¶¶163,

168; PageID.95 at ¶175. Unsurprisingly, Dr. Lipton continued to face public harassment, including at the September 5, 2024 meeting with top administrators during which Vassar singled out Dr. Lipton and again criticized him for his comment to The Detroit News. PageID.91-92 at ¶¶148-157. The Named Board Members also allowed Vassar and Denno to participate in the September 29, 2024 investiture ceremony in a deliberate public display of support. PageID.94 at ¶¶162-164. That the Named Board Members' response was inadequate is also reflected in a November 15, 2024 BSA Instagram post accusing Dr. Lipton of harassing students via the instant lawsuit.  PageID.95 at ¶¶171-174. Tellingly, Tebay and Scott acknowledged their role in facilitating Vassar and Denno's retaliation—stating "[w]e ruined your career" and "[y]ou should sue us," respectively. PageID.90 at ¶¶146-147. Accordingly, the Named Board Member's argument that they are entitled to dismissal based on qualified immunity because they were not involved in the retaliation and/or did enough in response is not persuasive. As discussed above, it was clearly established at the time that Dr. Lipton was engaged in protected conduct that Vassar and Denno's public campaign amounted to adverse action, and that the Named Board Members, having supervisory authority over Vassar and Denno, facilitated the retaliation with their tacit approval and outward displays of support for Vassar and Denno.

## II.    Plaintiff is entitled to prospective injunctive relief under *Ex parte Young*

To the extent that Defendants are being sued in their official capacities, Plaintiff is entitled to prospective injunctive relief pursuant to the exception to sovereign immunity established by *Ex parte Young*, 209 U.S.123, 160-62 (1908). *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."). Plaintiff seeks "the recall, resignation, or removal of Vassar and Denno from their positions on the MSU Board of Trustees," PageID.100 at ¶211, as well as

"an order enjoining any further disparagement or retaliation for his protected speech by any employee, agent, representative, or Trustee of MSU," PageID.101 at ¶212. *See also* PageID.103.

### a. Ongoing violation

Plaintiff has adequately alleged an ongoing violation of his First Amendment rights. Defendants argue that Plaintiff cannot seek injunctive relief by claiming that he has suffered only a discrete past harm. PageID.179-80; PageID.212-14; PageID.246. "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Following Denno and Vassar's initial retaliation against Dr. Lipton, including encouraging students to file complaints and letters against him, publicly disparaging him in a joint statement during the December 14, 2023 board meeting, and inviting students to further disparage him at the December 15, 2023 board meeting, Dr. Lipton continued to experience retaliation. Even after the censure of Vassar and Denno imposed in March of 2024, which removed them from all assigned duties and suspended them from Board activities for a limited period, PageID.89 at ¶134, Vassar publicly humiliated Dr. Lipton and accused him of labeling students at the September 5, 2024 meeting with top administrators, PageID.91-92 at ¶¶148-157. Then, the Named Board Members allowed Vassar and Denno to participate in the September 29, 2024 investiture ceremony and reception in a deliberate public display of support. PageID.93-94 at ¶¶162-164; PageID.94-95 at ¶¶168-169. Vassar and Denno were invited to sit on the stage in full academic regalia, with Dr. Lipton sitting ten rows from the stage. PageID.94 at ¶¶163, 165. This blatant disregard for the censure and public display of support for Vassar and Denno further chilled Dr. Lipton's speech. PageID.95 at ¶170. As recently as November 15, 2024, a BSA Instagram post falsely accused Dr.

Lipton of harassing students via the instant lawsuit, demonstrating Defendants' ongoing failure to address Vassar and Denno's false and retaliatory campaign against him. *Id.* at ¶¶171-174.

Unlike in the case Defendants cite, *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir. 2008), which involved a "one-time act that occurred in the past" and was "unlikely to recur," the instant case involves repeated retaliatory actions that have proven likely to recur in the future. This is especially so given that the imposed censure expired on January 1, 2025, restoring Vassar and Denno to their full positions on the Board. PageID.95 at ¶171. In addition, the injunctive relief Dr. Lipton seeks—enjoining further disparagement in retaliation for his protected speech—is quintessentially forward-looking, requiring Defendants to "conform [their] conduct in an ongoing, continuous fashion." *S & M Brands, Inc.*, 527 F.3d at 510. Thus, based on the repeated and continuous nature of Defendants' retaliatory conduct, the likelihood of recurrence, and the forward-looking nature of the relief sought, Plaintiff has satisfied the "straight-forward inquiry" into whether he has alleged an ongoing violation and is properly seeking prospective injunctive relief. *See Verizon Md.*, 525 U.S. at 645.

### b.  Plaintiff has pled his request for injunctive relief with adequate specificity

The Named Board Members and Vassar argue that Dr. Lipton's request for injunctive relief "enjoining any further disparagement or retaliation for his protected speech by any employee, agent, representative, or Trustee of MSU" is overbroad. PageID.181-83; PageID.262. This argument is inappropriate at the pleadings stage, and the Rule Defendants rely on—Federal Rule of Civil Procedure 65(d)(1)(C)—is not a pleading standard. *See Lloyd v. Pokorny*, No. 2:20-cv-2928 (S.D. Ohio Mar. 11, 2021) (noting that overbroad requests for injunctive relief are generally inappropriate, but that this not an issue typically addressed at the pleadings stage). Likewise, the cases Defendants cite in support of this argument all involve a court of appeals' assessment of an

injunction as ordered by a district court, not the assessment of a request for injunctive relief in a complaint under Rule 12(b)(6) review. [7]

While broad injunctions that merely require defendants to "obey-the-law" are generally disfavored, such injunctions are not *per se* impermissible. *Perez v. Ohio Bell Tele. Co.*, 655 F. App'x 404, 412 (6th Cir. 206). In at least one case, a federal court crafted a narrow injunction based on the federal-law violation alleged despite the request for an obey-the-law injunction. *See Bazzy Invs. v. City of Dearborn*, No. 16-10879, 2018 WL 10962765, at *8 (E.D. Mich. Aug. 2, 2018); *see also Coal, for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) (noting district courts "possess broad discretion to fashion equitable remedies"); *see also Comm'n v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (modifying order enjoining defendant from "discriminating against women" to describe in more detail discriminatory action to be avoided).

Defendants do not otherwise take issue with the factual basis underpinning Dr. Lipton's request for injunctive relief. He has alleged that Defendants repeatedly retaliated against him by, among other things, public disparagement (or, with respect to the Named Board Members, facilitation of disparagement). The proposed injunction both describes the specific conduct to be avoided: further "disparagement or retaliation for his protected speech" and names with adequate specificity who the injunction would apply to: "any employee, agent, representative, or Trustee of MSU," which would include all Defendants. Thus, accepting the well-pleaded facts as true, and considering the ongoing nature of Defendants' violations and the likelihood of recurrence discussed above, Dr. Lipton has provided an adequate basis at this early stage of litigation for the

---

[7]    *N.L.R.B. v. Teamsters, Chauffeurs, Helpers and Taxicab Drivers*, *Local Union 327*, 419 F.2d 1282, 1283 (6th Cir. 1970); *Smith v. Burk*, No. 1:19-CV-1018, 2022 WL 1459921 (W.D. Mich., May 9, 2022) (considering request for temporary restraining order not reviewed under Rule 12(b)(6); language of requested TRO not contained in the opinion); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)

requested injunctive relief. *See, e.g.*, *Ashford v. Univ. of Mich.*, 89 F.4th 960, 976 (6th Cir. 2024) (allowing First Amendment claim against state officers in their official capacities to proceed to trial where plaintiff sought an injunction preventing defendants from engaging in future retaliation or discrimination); *Dye v. Office of Racing Comm'n*, 692 F. Supp. 2d (E.D. Mich. 2010) (permitting request for injunctive relief under *Ex parte Young* to proceed to discovery where plaintiffs requested injunction prohibiting defendant from taking future adverse action against them because they engaged in constitutionally-protected speech). Any potential issues regarding the precise language of the requested injunctive relief would more appropriately be addressed after discovery.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the Board and Named Board Members' Motion to Dismiss (ECF No. 33), Denno's Motion to Dismiss (ECF No. 35) and Joinder (ECF No. 39), and Vassar's Motion to Dismiss (ECF No. 38).

Dated: May 2, 2025                    Respectfully Submitted,

ABDNOUR WEIKER LLP

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Coriann Gastol (P74904)
325 E. Grand River Ave., Ste. 250
East Lansing, MI 48823
P: (517) 994-1776
F: (614) 417-5081
liz@education-rights.com
coriann@education-rights.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH LCIVR 7.2(b)(i)

I hereby certify that this Brief complies with the limits set forth in LCivR 7.2(b)(i). Further, based on the Word Count function of Microsoft Word for Mac word processing software, applied to include all include headings, footnotes, citations and quotations, but not to include the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, I certify that this Brief contains 10,724 words.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour

## PROOF OF SERVICE

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour