UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK LIPTON,

    Plaintiff,

v.

    Case No. 1:24-cv-1029

    Hon. Hala Y. Jarbou

MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES, et al.,

    Defendants.
_____/

# OPINION

Plaintiff Jack Lipton brings this lawsuit against Defendants Michigan State University Board of Trustees ("BOT"), Dianne Byrum, Dennis Denno, Dan Kelly, Renee Knake Jefferson, Sandy Pierce, Brianna T. Scott, Kelly Tebay, and Rema Vassar.[1]  (Am. Compl., ECF No. 10.) Each individual defendant is a member of the BOT sued in their individual and official capacities. (*Id.* ¶ 40.)  Lipton claims Defendants violated his First Amendment rights by retaliating against his protected speech.  BOT, Byrum, Kelly, Jefferson, Pierce, Scott, and Tebay collectively filed a motion to dismiss.  (ECF No. 33.)  Denno and Vassar each also filed motions to dismiss.  (ECF Nos. 35, 38.)  For the reasons discussed herein, the Court will grant the motion to dismiss filed by the BOT, Byrum, Kelly, Jefferson, Pierce, Scott, and Tebay, grant in part and deny in part Denno's motion to dismiss, and deny Vassar's motion to dismiss.  Lipton's individual and official capacity claims against Vassar, and his individual capacity claim against Denno, will remain.

---

[1] The initial complaint only named the BOT as a defendant.  (ECF No. 1.)  Lipton amended his complaint after the BOT filed a motion to dismiss (ECF No. 6), rendering that motion to dismiss moot.

## I. BACKGROUND

Lipton joined Michigan State University ("MSU")'s faculty in 2009. (Am. Compl. ¶ 4.) He has held many roles during his time at MSU; he founded (and chairs) MSU's Department of Translational Neuroscience, he is the Associate Dean for Research Analytics in the College of Human Medicine, from August 16, 2023 to August 15, 2024, he served as the Faculty Senate Chair, and he began a term as the Faculty Senate Vice-Chair on August 16, 2024. (*Id.* ¶¶ 1, 11, 54.) The Faculty Senate Chair is the liaison between the MSU faculty and the BOT, and the Faculty Senate Chair delivers a formal address—on behalf of the faculty—at each public BOT meeting. (*Id.* ¶ 12.)

On October 20, 2023 (the early days of Lipton's tenure as the Faculty Senate Chair), Scott sent an open letter to her fellow BOT members. (*Id.* ¶ 55.) The letter accused BOT Chair Vassar of ethical violations and called for Vassar's resignation. (*Id.*) A week later, on October 27, 2023, the BOT held a highly attended meeting to discuss Vassar's alleged misconduct and whether she should resign. (*Id.* ¶¶ 14, 61.) Lipton spoke at this meeting in his capacity as Faculty Senate Chair, reading a resolution the Faculty Senate passed that called for Vassar's resignation. (*Id.* ¶¶ 14-15.)

According to the amended complaint, the meeting was contentious and chaotic, and whenever "any meeting attendee spoke in support of holding Vassar accountable for her actions as outlined in Scott's letter, Vassar supporters interrupted and jeered them and attempted to prevent them from completing their statements." (*Id.* ¶¶ 62-63.) The typical rules regarding permission to speak were ignored, and the BOT Secretary was pressured to allow nonregistered speakers to voice their support for Vassar. (*Id.* ¶¶ 64-67.) There was a lack of order, culminating in police officers escorting at least one attendee from the meeting. (*Id.* ¶¶ 68, 129.)

After the meeting,[2] a reporter asked Lipton whether he thought the faculty's concerns, and the general allegations against Vassar, had been sufficiently addressed. (*Id.* ¶ 70.) Lipton, clarifying that "he would speak [to the reporter] as a private individual and not on behalf of the Faculty Senate," said: "The board meeting yesterday, filled with Chair Vassar supporters, demonstrated Trustee Scott's charges of intimidation and bullying in action. The chaos brought and disrespect shown by her supporters could have been stopped by a single statement from Chair Vassar, yet she elected to let the mob rule the room." (*Id.* ¶ 71.)

In the wake of Lipton's comment, Vassar and her BOT colleague Denno allegedly began a retaliation campaign against Lipton. Vassar and Denno met with MSU students, encouraging them to publicly condemn Lipton and file complaints of racial discrimination against him. (*Id.* ¶ 77.) Vassar's supporters and associates published statements and op-eds calling Lipton racist, anti-Palestinian, and anti-Muslim, citing his use of the term "mob" to describe the crowd. (*Id.* ¶¶ 81-94.) According to a third-party investigator that MSU hired, Vassar and Denno advised students and supporters on how to attack Lipton for his statement, coordinating with them on the phrasing of these public condemnations and complaints. (*Id.* ¶¶ 20-22, 95, 118, 120-23, 125.)

The BOT met for its next scheduled meeting on December 15, 2023, however it was held virtually due to security concerns from the October meeting. (*Id.* ¶¶ 97, 113.) Vassar and Denno attended this meeting in their official capacities while in a room filled with MSU students, and during the meeting's public comment period, these students spoke out against Lipton. (*Id.* ¶¶ 98-104.) Vassar and Denno invited these students to participate in the meeting with them. (*Id.*) Lipton spoke at the meeting—per his responsibilities as Faculty Senate Chair—apologizing for his

---

[2] The amended complaint does not specify precisely when the reporter asked for Lipton's comment. Lipton only alleges that the request for comment took place after the BOT meeting concluded. (Am. Compl. ¶ 70.) From the nature of the comment, describing the BOT meeting as happening "yesterday," Lipton gave his statement on October 28, 2023, but the reporter may have asked for Lipton's comment at another time.

3

comment, explaining his intent behind it, and continuing to criticize Vassar and Denno for their actions as BOT members.  (*Id.* ¶ 113.)

After the third-party investigation detailed Vassar and Denno's coordination with students to publicly condemn Lipton for his comment, the BOT voted to censure Vassar and Denno.  (*Id.* ¶ 131-32.)

Lipton was promoted to the position of Associate Dean for Research Analytics after this incident; however, when he searched for career advancement opportunities outside of MSU, "an executive search firm associate shared that the public attacks on his character . . . will negatively impact his employment chances."  (*Id.* ¶ 138.)

Lipton alleges that the retaliation has continued.  He cites an exchange between himself and Vassar at a BOT meeting on September 5, 2024.  Vassar asked Lipton to share an example of a lack of civil discourse.  (*Id.* ¶¶ 149-50.)  Lipton referenced a previous meeting when Vassar displayed an explicit gesture (middle finger) to another BOT when they were speaking.  (*Id.* ¶¶ 151-52.)  In response, Vassar denied that any such interaction took place and insinuated that Lipton "did not have any grounds to speak about civil discourse" due to his comment to the press that used the term "mob."  (*Id.* ¶ 153-54.)  This interaction between Lipton and Vassar took place in the presence of the BOT members, MSU President Kevin Guskiewicz, MSU Interim Provost Thomas Jeitschko, MSU General Counsel Brian Quinn, and other members of the MSU faculty.  (*Id.* ¶ 155.)

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels

4

and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).

### III. ANALYSIS

Under 42 U.S.C. § 1983, official-capacity claims are limited to injunctive or declaratory relief for prospective harms, while personal-capacity claims may seek damages for prior harms. *See Cooperrider v. Woods*, 127 F.4th 1019, 1027, 1043 (6th Cir. 2025). Because Lipton sued the BOT as an entity and each BOT member in their official and individual capacities, the Court must first determine issues of immunity.

### A. Qualified Immunity for Individual-Capacity Claims

Each individual defendant suggests qualified immunity prevents Lipton's personal-capacity claims. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The burden is on Lipton to show (1) that Defendants violated his constitutional rights,

5

and (2) "that the 'contours of the right' were sufficiently clear that 'a reasonable official in [Defendants'] position should have known his conduct violated that right.'" *Cooperrider*, 127 F.4th at 1036 (quoting *Ramsey v. Rivard*, 110 F.4th 860, 866 (6th Cir. 2024)).

### 1. Violation of Lipton's Constitutional Rights

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from 'abridging the freedom of speech.'" *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) (quoting U.S. Const. amend. I).  However, "[t]hat freedom is, of course, not unlimited." *Id.*  For a public employee like Lipton to "prove a First Amendment retaliation claim, [he] must show: (1) he engaged in protected speech; (2) the defendant took an adverse action against him; and (3) there is a causal connection between the protected speech and the adverse action." *Id.*

#### (a) Protected Speech

The first question is whether Lipton's statement to the press about the October 27, 2023 BOT meeting constitutes protected speech.  While a public employee's interest to speak freely may conflict with an "employer's interests in running an efficient workplace . . . the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern; (2) the speech was not made pursuant to the employee's official duties; and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees." *Id.* at 783-84 (internal citations omitted).

*Speech on a Matter of Public Concern*

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*

*v. Myers*, 461 U.S. 138, 147-48 (1983).  When the speech relates "to any matter of political, social, or other concern to the community," it is a matter of public concern.  *Id.* at 146.  When an individual speaks in an effort "to bring to light actual or potential wrongdoing or breach of public trust," it is certainly a matter of public concern.  *Id.* at 148.  Lipton spoke out in criticism of a public official—the Chair of the BOT.  He commented on the nature of a well-attended, highly publicized meeting of a public body.  He made his statement as a commentary on whether the BOT meeting served the public interest by addressing the alleged charges against Vassar, and he framed his message to suggest that Vassar's conduct at the meeting provided additional proof that she will abuse her position of power in a self-serving manner.  Charges of ethical violations, the resignation of a public official, and whether the public meeting allowed for the proper consideration of misconduct are all important matters of concern for the community and the public at large.  Whether or not Lipton was convincing, and irrespective of whether the language he used undermined his message, his speech was certainly addressing a matter of public concern.

*Speech Not Pursuant to Official Duties*

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  The Court must determine whether Lipton's statement to the press was part of his official duties.

The question is not whether Lipton's speech "concerned the subject matter of [his] employment," as "[t]he First Amendment protects some expressions related to the speaker's job."  *Id.*  Members of the community who are "most likely to have informed and definite opinions" on important topics due to their public employment may still contribute to public discourse.  *Id.* (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 572, 574 (1968)).

7

In fact, it is essential that public employees can bring their knowledge and expertise into these discussions, contributing as informed private citizens. *See id.* (discussing "the necessity for informed, vibrant dialogue in a democratic society"). For example, educators should be free to comment to the press regarding the general operations of the school for which they work, even if the statement is "directed at their nominal superiors." *See Pickering*, 391 U.S. at 572, 574 (protecting a teacher's right to send a letter to the local newspaper criticizing the School Board's handling of spending matters).

"[C]ourts have asked several recurring questions" to determine whether speech was pursuant to job responsibilities. *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021). Courts ponder the motivation behind the speech, distinguishing speech that fulfills a job responsibility from speech that a public employee decides to do on their own volition. *Id.* Courts also look to whether the employee was "on the clock" during the speech. *Id.* (noting that speech "at the employer's place of business is more likely to be speech as a government agent," but an employee "act[s] as a private citizen when he call[s] city council members from his home as a concerned taxpayer"). And courts seek to determine "the speech's audience," as "[s]peech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals." *Id.* (recognizing that "an officer who issued his own 'press release'" voicing concerns about his workplace to the public at-large, "acted as a concerned citizen" rather than a government agent).

Lipton's comment to the press was not made pursuant to his duties as a professor nor his duties as the Faculty Senate Chair. He was by no means required to make this statement per his job responsibilities, this was not "on-the-clock" speech (he made his statement the day after the meeting (*id.* ¶ 17), and even though he was talking about his supervisors, he was speaking to the public via the press.

8

Lipton made the statement as an individual who, due to his public position, was uniquely situated to provide an informed perspective. He was required to attend the BOT meeting to relay faculty concerns as the liaison to the BOT, and he was well-informed as to the charges against Vassar. But much like the teacher in *Pickering*, Lipton's statement, while related to the subject matter of his employment, was not pursuant to his official duties. Lipton was not speaking on behalf of the faculty, and he was no longer speaking as the liaison to the BOT; he was commenting as a private citizen who was present at the BOT meeting and had an opinion on a matter of public importance. Even though Lipton was identified in the article as the Faculty Senate Chair, the mere reference to his official title for contextual purposes does not render the speech part of his official duties. *See Josephson*, 115 F.4th at 784 (holding that even though the plaintiff was identified as a University of Louisville Medical School professor, and was speaking about his academic research, his statements at a Heritage Foundation panel were not pursuant to his official duties). "[T]he impetus or motivation behind" Lipton's speech was the journalist's desire for Lipton "to share his own opinions" about the BOT meeting. *Id.* Considering the context, Lipton's statement was not pursuant to his official duties.

*Employee's Interest Outweighing the Employer's Interest*

Because Lipton has satisfied the first two prongs of protected speech, the Court must ask whether "the employee's interest in speaking on a matter of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees." *Id.* By speaking out on charges of ethical violations and abuse of public trust, Lipton touched upon "matters of profound 'value and concern to the public.'" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 914 (2018) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "[S]uch speech 'occupies the highest rung of the hierarchy of First Amendment values' and merits 'special

9

protection.'" *Id.* (quoting *Snyder*, 562 U.S. at 452).  Because Lipton's speech "substantially involves matters of public concern," the Court may require "a stronger showing of government interests" in order to outweigh the essential protections afforded Lipton's speech. *Josephson*, 115 F.4th at 784 (cleaned up) (quoting *Lane v. Franks*, 573 U.S. 228, 242 (2014)).

To evaluate the BOT and its members' interest promoting the efficient performance of public services, the Court considers several factors, including whether Lipton's speech "(1) meaningfully interfered with the performance of his duties, (2) undermined a legitimate goal or mission of the employer, (3) created disharmony among co-workers, (4) impaired discipline by superiors, or (5) destroyed the relationship of loyalty and trust required of confidential employees." *Id.* (cleaned up) (quoting *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003)).

From the alleged facts, Lipton's speech did not interfere with the efficient performance of MSU's public services nor the BOT's functions; the BOT continued to hold its meetings. (Am. Compl. ¶¶ 105, 113.)  Lipton was promoted to Associate Dean for Research Analytics after his comment to the press (*id.* ¶ 50), indicating that he could continue to perform his duties and further MSU's general mission as an academic institution.  While some faculty members sought to distance themselves from Lipton following his comment and the subsequent backlash (*id.* ¶¶ 108-09), after his term as Faculty Senate Chair ended, Lipton was elected Faculty Senate Vice Chair (*id.* ¶ 54), a position he would presumably not assume if his comments generated cognizable disharmony among his co-workers.  And nothing in the amended complaint suggests Lipton's comments impaired discipline or destroyed a relationship of loyalty and trust.  There were complaints filed against Lipton that seemed to proceed through a normal process (*id.* ¶¶ 82-83, 90-92, 114-15), and it appears Denno never had a trusting relationship with Lipton that could have been destroyed by this comment to the press. (*See id.* ¶ 127 (Denno calling Lipton a "tool" for the

10

Administration)). Meanwhile, other BOT members still felt comfortable sharing their sensitive thoughts with Lipton, even after his comments. (*See id.* ¶¶ 146-47 (BOT members telling Lipton that he should sue because the BOT "ruined [his] career").) Considering all the factors, the balance of interests tips in Lipton's favor.

\* \* \*

Lipton spoke on a matter of public importance when he discussed his concerns about the BOT meeting. He did not make his comment pursuant to any official duties, and his interest in speaking on this public matter outweighs his employer's interest in promoting the efficiency of the public service it performs. Thus, he engaged in protected speech when he made his comment to the reporter after the BOT meeting on October 27, 2023.

### (b) Adverse Action and Causal Connection

Even if his speech was protected, to state a claim for a First Amendment violation, Lipton must have alleged facts showing "that each [d]efendant took an adverse action against him 'motivated at least in part' by his protected speech." *Josephson*, 115 F.4th at 787 (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). "An adverse action in the First Amendment retaliation context is an action that 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014)). "Any adverse actions, other than 'those that create only de minimis negative consequences,' can 'offend the Constitution.'" *Id.* (quoting *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021)). For § 1983 claims, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Thus, Lipton must allege that each defendant took adverse action against him that was motivated by his speech.

Lipton adequately alleges that both Vassar and Denno took adverse action against him, and that the adverse action was motivated by his protected speech. Vassar and Denno used their

11

positions as BOT members to attack Lipton for the comment he made as a private citizen. They made these attacks as BOT members and at BOT meetings. (Am. Compl. ¶¶ 96, 99-104.) Additionally, Vassar and Denno used their BOT pulpit to funnel adverse action towards Lipton via proxies, leveraging their BOT membership to speak through students, supporters, and members of the public. (*Id.* ¶¶ 20-22, 95, 118, 120-23, 125.)

These attacks (i.e., public condemnations, op-eds, and official complaints) through proxies are independent constitutional violations so long as it is clear that the defendants engaged in conduct that was motivated by the plaintiff's protected speech and had the requisite chilling effect on First Amendment activity. *Josephson*, 115 F.4th at 788-89 (explaining that adverse action "perpetrated by a third party who is not the employer" can still amount to a First Amendment violation (citing *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 726 (6th Cir. 2010))). Lipton alleges facts that illustrate the affirmative actions Vassar and Denno took—while acting as BOT members—that were motivated by Lipton's speech and would chill First Amendment activity of a person of ordinary firmness. Vassar and Denno crafted the language that others would use to attack Lipton. They pushed students to file complaints. And while engaging in their official responsibilities at the December 15, 2023 BOT meeting, they coordinated with students to raise attacks against Lipton due to his protected speech. Public officials cannot insulate themselves from violating the First Amendment's protections by simply manipulating others to engage in retaliatory conduct—particularly when they leverage their public positions to do so. *See Josephson*, 115 F.4th at 789 (retaliatory conduct through a third-party constitutes adverse action) (citing *Fritz*, 592 F.3d at 726).

Vassar and Denno, along with others who spoke out against Lipton, are entitled to take issue with Lipton's phrasing. But the allegations suggest that Vassar and Denno sought to attack

12

Lipton to protect their positions on the BOT; they told students "to help us," a call to action seeking to silence Lipton for his statement that questioned Vassar's conduct on the BOT, not to discuss the implications of a faculty member using what some may have perceived as racially charged language. (Am. Compl. ¶ 93.) "An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Josephson*, 115 F.4th at 789 (cleaned up). Lipton has plausibly alleged that Vassar and Denno were motivated by retaliation, not a desire to raise concerns in the marketplace of ideas. As Lipton's supervisors (Am. Compl. ¶ 88 (noting that the BOT approves promotion and tenure for faculty)), Vassar and Denno crossed the line into conduct the First Amendment forbids, using their positions of public authority to take adverse action against Lipton due to his protected speech.

Defendants argue that Lipton faced no real adverse action. They note that he was promoted to Associate Dean for Research Analytics after these coordinated attacks on his character. However, according to "an executive search firm associate," Vassar and Denno's alleged coordinated attack against Lipton hindered his employment opportunities outside MSU. (*Id.* ¶ 138.) "The 'power to substantially affect' a public employee's livelihood could be enough to establish an adverse action.'" *Josephson*, 115 F.4th at 788 (quoting *Fritz*, 592 F.3d at 726). And "actions 'designed to threaten' a person's 'economic livelihood' are likely to deter a person of ordinary firmness from engaging in protected speech." *Id.* (quoting *Fritz*, 592 F.3d at 728). From the allegations, it is reasonable to infer that Vassar and Denno sought to jeopardize Lipton's career and economic opportunities in an effort to change his behavior and prevent continued statements against Vassar's conduct on the BOT. The public condemnations and official complaints by students would chill the speech of a person of ordinary firmness. Additionally, "campaigns of

13

harassment, when considered as a whole, may amount to adverse action." *Id.* at 789 (citing *Fritz*, 592 F.3d at 724). Looking to the totality of Vassar and Denno's campaign of harassment, both in its scope (public comments at BOT meeting, statements, complaints, etc.) and content (condemnation as a racist), Vassar and Denno's conduct constituted adverse action against Lipton, and it was motivated by his protected speech.

While the amended complaint details the specific actions that Vassar and Denno took against Lipton, the only alleged involvement of the other BOT members was their lack of action. Lipton alleges that the other members of the BOT retaliated against him by failing to intervene; however, the BOT "voted to censure Vassar and Denno." (Am. Compl. ¶ 131-32.) Lipton does not allege that the other BOT members attacked him in any way, nor does he allege that the other BOT members used their public positions to engage in adverse action by speaking through others. Lipton fails to allege facts that indicate the other BOT members took adverse action against him for his speech.

* * *

Lipton's comment to the press expressing concern about the October 27, 2023 BOT meeting was protected speech. Because of that speech, Vassar and Denno allegedly took adverse action against Lipton. In doing so, they violated Lipton's First Amendment rights. However, the other members of the BOT did not commit such violations. Thus, the individual-capacity claims against Byrum, Kelly, Jefferson, Pierce, Scott, and Tebay will be dismissed.

### 2. Whether Lipton's Rights Were Clearly Established

Having determined that Vassar and Denno violated Lipton's constitutional rights, the Court must next determine whether Vassar and Denno should have known their conduct was unconstitutional. The question is not whether "an earlier decision . . . is directly on point" with the facts in this matter. *Josephson*, 115 F.4th at 789 (quoting *McElhaney v. Williams*, 81 F.4th

550, 556-57 (6th Cir. 2023)).  A right is clearly established if "'existing precedent' . . . place[s] the contours of the right 'beyond debate.'"  *Id.* (quoting *McElhaney*, 81 F.4th at 556-57).

As the Court of Appeals recently determined, "[b]y the fall of 2017," well before Vassar and Denno's conduct, "both the Supreme Court and this [circuit] had held that, absent a disruption of government operations, a public university may not retaliate against a [faculty member] for speaking on issues of social or political concern."  *Id.* (citing *Pickering*, 391 U.S. at 574; *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001)).  The contours of the right, as outlined in the Court's discussion of the constitutional violation, were already established.  *Id.*  Vassar and Denno's conduct fit well within those boundaries.  *Id.*

Lipton has alleged facts showing that Vassar and Denno violated his clearly established constitutional rights.  Thus, at this stage, qualified immunity for Vassar and Denno will be denied.  Lipton has stated a claim against Vassar and Denno in their individual capacities.

### B. Sovereign Immunity for Official-Capacity Claims

Lipton also sued each defendant in their official capacities.  "The Eleventh Amendment to the United States Constitution bars actions 'against states unless they consent to be sued or Congress, pursuant to a valid exercise of its power, unequivocally expresses its intent to abrogate sovereign immunity.'"  *Cooperrider*, 127 F.4th at 1043 (quoting *Ashford v. Univ. of Mich.*, 89 F.4th 960, 969 (6th Cir. 2024)).  "And 'although the text does not explicitly say so, Eleventh Amendment immunity precludes suits brought against a State by its own citizens.'"  *Id.* (quoting *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 863 (6th Cir. 2024)).  The BOT, as an entity, is an arm of the state that is immune from this lawsuit under the Eleventh Amendment.[3]  *Brock v. Mich. State*

---

[3] Lipton also tries to state a claim against the BOT, as an entity, and the BOT members under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  But *Monell* liability only applies to local governments, not state entities.  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 69-71 (1989).  And because an official-capacity

*Univ.*, No. 1:21-cv-436, 2022 WL 178681, at *3 (W.D. Mich. Jan. 20, 2022); *see also McKenna v. Bowling Green State Univ.*, 568 F. App'x 450, 457 (6th Cir. 2014) (attaching Eleventh Amendment immunity to public universities and their Board of Trustees as arms of the state). Thus, the BOT will be dismissed as a defendant.

This sovereign immunity does not protect the BOT members in their official capacity to the extent that Lipton sued them "seeking equitable relief for ongoing violations of federal law." *Cooperrider*, 127 F.4th at 1043-44 (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). To determine whether Lipton has alleged an ongoing violation, the Court "need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (evaluating whether the plaintiff stated a claim for First Amendment retaliation against the defendants in their official capacities (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002))).

Lipton seeks a number of equitable remedies, although many must be sought through other avenues. For example, Lipton "is seeking the recall, resignation, or removal of Vassar and Denno from their positions on the MSU Board of Trustees." (Am. Compl. ¶ 211.) The Court does not have the authority to grant such relief. *See* Mich. Comp. Laws § 168.293 (the governor has removal power for BOT members); *Buback v. Romney*, 156 N.W.2d 549, 553 (Mich. 1968) (the judiciary may not exercise removal power assigned to another branch of government). Lipton does not seek prospective relief that could apply to Byrum, Kelly, Jefferson, Pierce, Scott, or Tebay. Thus, claims against these defendants—raised in their official capacity—will also be dismissed.

---

claim serves as a claim against the official's public entity, the *Monell* claims fail as a matter of law; Lipton does not allege any municipal or local government involvement. He also does not allege any policy or pattern of behavior.

The only appropriate prospective relief Lipton seeks is an injunction that prevents continued retaliation against his speech. While Lipton has alleged facts that suggest Vassar continues to retaliate against him for his protected speech and is unlikely to stop without injunctive relief (Am. Compl. ¶¶ 148-55), he has not alleged facts that indicate Denno has continued to retaliate post-censure. Lipton seeks injunctive relief preventing Vassar from the alleged continued retaliation, so the claim against Vassar in her official capacity will remain. However, Lipton has not adequately demonstrated continuing constitutional violations against Denno, so his official-capacity claim against Denno will be dismissed.

## IV. CONCLUSION

Lipton has alleged facts that sufficiently state a claim for a First Amendment violation against Vassar and Denno in their individual capacities. According to the amended complaint, Lipton's comment to the press about the October 27, 2023 BOT meeting was protected speech, and Vassar and Denno's subsequent conduct was retaliatory adverse action. Lipton has also demonstrated that Vassar will continue to retaliate against him for this speech, but he did not demonstrate the need for prospective relief from Denno. Additionally, Lipton fails to state a claim against the BOT (as an entity), Byrum, Kelly, Jefferson, Pierce, Scott, and Tebay.

Lipton's individual and official capacity claims against Vassar, and his individual capacity claim against Denno, will remain. The rest of Lipton's claims will be dismissed.

An order consistent with this Opinion will issue.

Dated: May 28, 2025         /s/ Hala Y. Jarbou
                            HALA Y. JARBOU
                            CHIEF UNITED STATES DISTRICT JUDGE